UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SANDRA HOPE SCHAFER,

    Plaintiff,

v.	Case No. 1:02-CV-593

COST PLUS, INC., et al.,	HON. GORDON J. QUIST

    Defendants.
_____/

## OPINION

    Plaintiff, Sandra Hope Schafer ("Plaintiff"), has alleged numerous civil rights violations against Defendants, Cost Plus, Inc. ("Cost Plus") and Kate Nelson ("Nelson") (collectively "Defendants"), for discrimination and constructive discharge based on Plaintiff's national origin, American-Southern, and Plaintiff's disability, epilepsy, under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a), the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, the Michigan Persons with Disabilities Civil Rights Act ("PDCRA"), M.C.L. §§ 418.1-418.941, and the Elliot-Larsen Civil Rights Act ("ELCRA"), M.C.L. §§ 37.2101-2804. Plaintiff has also alleged tort claims under Michigan law for intentional infliction of emotional distress and negligent supervision. Before the Court is Defendants' motion for summary judgment on all counts. The Court will grant Defendants' motion.

### Facts and Procedural History

    Plaintiff is a white female born on November 30, 1958. (Charge Form, Pl.'s Answer Defs.' Mot. Summ. J. Ex. I.) "Plaintiff's ethnic and cultural upbringing was rooted in the Southern

traditions and particular affectations of the regional flavor of that American locale," (Compl. ¶ 17), and Plaintiff has a "very distinctive Southern accent," (Id. ¶ 18). Plaintiff has been diagnosed with epilepsy and is unable to lift heavy items due to a prior neck surgery. (Pl. Dep. at 182, 111, Pl.'s Answer Defs.' Mot. Summ. J. Ex. B.)

On September 13, 1999, Plaintiff was hired by Cost Plus as a sales associate in Cost Plus' Lansing, Michigan, store. (Id. at 112; Nelson Decl. ¶ 2.) Plaintiff reported to Nelson, the store manager, and Plaintiff's job performance generally met expectations. (Id. at 119.) Plaintiff did not mention her epileptic condition during the hiring process, but she disclosed it to Nelson in the latter part of 1999. (Id. at 182.) According to Plaintiff, her epileptic condition only limits her ability to work when she is actually having a seizure, or in the days immediately following a seizure when she is required to rest. (Id. at 182-83.) Plaintiff estimates that she had a total of three seizures from 1997 through 2002. (Id. at 183.)

Plaintiff also told Nelson that she was unable to lift heavy items, and Nelson replied that it would not be necessary. (Id. at 111.) It does not appear that Plaintiff was ever required to do any heavy lifting during her employment with Cost Plus. Plaintiff's usual assignment was to work the cash register at the front of the store. (Id. at 113; Nelson Decl. ¶ 2.)

Plaintiff had two epileptic incidents during her employment with Cost Plus. (Pl. Dep. at 169.) On one occasion Plaintiff felt a seizure coming on, received permission to leave work early, and drove herself home. (Id. at 156, 160-61.) The second incident occurred in February 2001, when Plaintiff had a seizure at work. (Id. at 162.) On the day of the seizure, Plaintiff informed Nelson that she felt a seizure coming on so Plaintiff and Nelson went to the offices located in the back of the store. (Id. at 161-62.) Plaintiff had the seizure in the office area, and Plaintiff's husband came to

2

the store to take Plaintiff home. (Id. at 162-63.) Following the seizure, Plaintiff took several days off before returning to work without any interference from her epilepsy or any other medical condition for the remainder of her employment at Cost Plus.

On June 18, 2001, Plaintiff resigned her employment at Cost Plus. (Charge Form, Pl.'s Answer Defs.' Mot. Summ. J. Ex. I.) In the final three months of Plaintiff's employment with Cost Plus, Plaintiff had several interactions with her Cost Plus supervisors, which led to Plaintiff's decision to resign her employment.

### A. The Intercom Incident

In April 2001, Nelson requested that Plaintiff alter the way that she announced incoming telephone calls over the store's intercom system due to complaints by some employees that they could not understand Plaintiff when she said certain numbers. (Pl. Dep. at 13; Nelson Decl. ¶ 3.) Apparently this was due in part to Plaintiff's strong Southern accent. (Nelson Decl. ¶ 3.) Nelson instructed Plaintiff to shorten her pages to only include the name of the person being called and the line number on which the caller was holding. (Id.) Nelson also asked Plaintiff to "speak more slowly and direct calls to two particular numbers to alleviate the problem of not being understood." (Id.) Plaintiff stated that she was offended by Nelson's request and that she did not understand why Nelson had not raised the issue with her earlier. (Pl. Dep. at 15-19.)

### B. The "Secret Shopper"

On May 17, 2001, a customer at Plaintiff's register wanted to purchase a bottle of wine that did not have a product code on it. (Id. at 32.) This made it impossible for Plaintiff to ring up the bottle of wine. (Id.) Nelson was out of town that day, so Plaintiff used the store intercom to page Assistant Manager Kirk Reedy ("Reedy"). (Id.) Reedy did not immediately answer Plaintiff's page,

3

and customers began to line up at Plaintiff's register. (Id. at 32-33.) According to Plaintiff, she offered to page another cashier, but the customers said that they preferred to wait for Plaintiff to ring them up. (Id.) Plaintiff claims that after several minutes passed, the customer with the unmarked bottle of wine asked Plaintiff to call for a "service 10" over the intercom. (Id. at 33.) There was no response to Plaintiff's page, so Plaintiff paged Reedy by name. (Id. at 34.) Plaintiff claims that Reedy called her on the telephone, raised his voice to her, and asked that she not page him repeatedly. (Id.) Shortly thereafter, Reedy arrived at Plaintiff's register and rang up the wine. (Id. at 35-36.) Reedy apologized to the waiting customers and said that he had been delayed because he was receiving a delivery truck at the back of the store. (Id.)

Plaintiff contends that after Reedy left, a woman in line told the man with the bottle of wine that there was a customer corporate complaint phone number and suggested that the man call in a complaint. (Id. at 39-41.) The man with the bottle of wine allegedly said he already had the number because he was "one of the higher monkey monks of this place, and I like to make sure–I like to check on my stores from time to time to see that they're running properly." (Id. at 39-40.) The man with the wine then handed some of the customers a business card, on the back of which he wrote a phone number. (Id.) Plaintiff states that she did not take one of the business cards, but she saw that the phone number given was the corporate complaint number. (Id. at 43, 40-41.)

Plaintiff spoke to Reedy a short time later and told him that the man with the wine was a "secret shopper," who was actually a Cost Plus employee. (Id. at 45.) Plaintiff also told Reedy that the "secret shopper" had distributed his business card and the corporate complaint number. (Id.) Reedy then called Nelson and relayed Plaintiff's story to her. (Nelson Decl. ¶ 4.) Nelson called her District Manager, who stated that no "secret shopper" was in the Lansing store on the day in question

4

and no complaints had been made to the corporate complaint number. (Nelson Decl. ¶ 6.)

When Nelson returned to the Lansing store approximately one week later, she confronted Plaintiff in a backroom of the store regarding Plaintiff's version of what happened on May 17. (Pl. Dep. at 45-47; Nelson Decl. ¶ 7.) Nelson asked Plaintiff to repeat her version of the events that day and what had happened between Plaintiff and Reedy. (Pl. Dep. at 31-32.) Nelson listened to Plaintiff's account and then informed Plaintiff that she had been unable to confirm any of the details of Plaintiff's story. (Id. at 45-46; Nelson Decl. ¶¶ 6-7.) Nelson also stated that she did not find Plaintiff's story credible and that she was tired of Plaintiff's attitude toward Reedy. (Pl. Dep. at 45-47; Nelson Decl. ¶¶ 7-8.) Nelson states that Plaintiff said that she believed that Reedy "did not appreciate the customer issues she handled on a regular basis and said that she had decided to show [Reedy] what kind of power she had as the first cashier." (Nelson Decl. ¶ 7.) Plaintiff claims that Nelson criticized Plaintiff's Southern accent, told Plaintiff that none of the other employees liked her, asked why Plaintiff was "fabricating all this," and told Plaintiff that if Plaintiff did not quit then Nelson would make Plaintiff's life a "living hell" until Plaintiff quit. (Pl. Dep. at 45-52.) Nelson denies criticizing Plaintiff's accent or calling Plaintiff a liar. (Nelson Decl. ¶¶ 9-10.) Nelson states that she told Plaintiff that she would be reassigned from cashier to "sparkle," or cleaning the store's glassware, the next day. (Id. ¶ 8.) Nelson also states that she told Plaintiff that she would like Plaintiff to quit if Plaintiff's attitude did not improve. (Id. ¶ 10.)

C.  **Plaintiff's Dissatisfaction with Her Assignment to "Sparkle" and the Beverage Department**

The next day, Plaintiff was assigned to "sparkle." (Pl. Dep. 78, 82, Nelson Decl. ¶ 11.) Plaintiff told Nelson that she did not know how to "sparkle," and a heated discussion ensued between Plaintiff and Nelson. (Id.) During their discussion, Plaintiff asked Nelson for the phone

number of Cost Plus' Human Resources Department. (Nelson. Decl. ¶ 11.) Nelson told Plaintiff that she didn't like where the discussion was going and offered to call a "truce" to go outside and talk. (Pl. Dep. at 78-82; Nelson Decl. ¶ 12.) Once outside, Plaintiff and Nelson discussed the previous day's conversation. (Nelson Decl. ¶ 12.) Plaintiff said that she was offended that Nelson accused her of lying, and Nelson said it was Plaintiff's word against everyone else's word (Pl. Dep. at 84-85.) Nelson also apologized for hurting Plaintiff's feelings. (Id. at 85-86.) Plaintiff and Nelson agreed that it would be a good idea for Plaintiff to use her accumulated sick and vacation days to take some time off. (Id. at 87.) Nelson states that she agreed to let Plaintiff take the time off because Plaintiff told Nelson that her son may have contracted tuberculosis and she wanted to spend some time with her family. (Nelson Decl. ¶ 12.) Plaintiff claims that Nelson told her that she could resume her duties as head cashier when she returned from vacation. (Pl. Dep. at 90.) Nelson states that she told Plaintiff that she would not be reassigned to her former cashier position upon her return. (Nelson Decl. ¶ 12.)

On June 18, 2001, Plaintiff returned to work and was assigned to a four-hour shift in the beverage department. (Pl. Dep. at 91, 93.) Upon her arrival, Nelson explained to Plaintiff that Plaintiff's job was to dust each of the wine bottles and make sure each was price coded. (Id. at 91-92; Nelson Decl. ¶ 13.) Plaintiff states that the department manager asked her if everything was okay twice during Plaintiff's shift, but other employees did not speak to her. (Pl. Dep. at 92-93.) After Plaintiff clocked out that day, she did not return to work or call to explain her absence. (Id. at 94, Nelson Decl. ¶ 13.) After Plaintiff was absent for the fourth consecutive day without calling in, Nelson processed Plaintiff's termination papers pursuant to Cost Plus' "no call, no show" policy. (Nelson Decl. ¶ 13.) Nelson states that this was the only reason why Plaintiff was terminated. (Id.)

**D.     Plaintiff's Complaint to Cost Plus' Human Resources Department**

On June 19, 2001, the day after the last day Plaintiff actually worked at Cost Plus, Plaintiff called Cost Plus' Human Resources Department to complain about Nelson. (Pl. Dep. at 95-96.) Plaintiff spoke with Andrew Woodyard ("Woodyard") and described her version of her May 23, 2001, conversation with Nelson and her assignment to the beverage department.[1] (Id.) Woodyard apparently told Plaintiff that he would investigate her allegations and call Plaintiff back. (Id.) The next day Woodyard called Plaintiff and informed her that he was unable to verify many of Plaintiff's allegations. (Id. at 96-97.) Plaintiff claims that Woodyard did not talk with her "witnesses," but only with "management." (Id.) Plaintiff elected not to return to work. (Id. at 109; Nelson Decl. ¶ 13.)

**E.     Plaintiff's EEOC Complaint**

On March 11, 2002, Plaintiff filed a charge form with the Equal Employment Opportunity Commission ("EEOC"). (Charge Form, Pl.'s Answer Defs.' Mot. Summ. J. Ex. I.) Plaintiff's EEOC charge form alleges that Cost Plus discriminated against her on the basis of national origin and disability. (Id.) On April 18, 2001, the EEOC issued Plaintiff a right-to-sue letter. (Right-to-Sue Letter, Cooper Decl. Ex. A.) Plaintiff filed the instant suit on July 23, 2002.

**Standard of Review**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute over trivial facts which are not necessary in order to apply the substantive

---

[1] Woodyard has apparently not been deposed in this matter.

law does not prevent the granting of a motion for summary judgment. Id. at 248, 106 S. Ct. at 2510. The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. Id. This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. Id. at 251, 106 S. Ct. at 2511 (citing Improvement Co. v. Munson, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)). "A party may not create a factual issue by filing an affidavit [or making arguments in a brief], after a motion for summary judgment has been made, which contradict[ the party's] earlier deposition testimony." Reid v. Sears, Roebuck & Co., 790 F.2d 453, 460 (6th Cir. 1986).

A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 324-25, 106 S. Ct. 2548, 2553-54 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. Id.; Frank v. D'Ambrosi, 4 F.3d 1378, 1384 (6th Cir. 1993). The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Agristor Financial Corp. v. Van Sickle, 967 F.2d 233, 236 (6th Cir. 1992) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## Discussion

### I.      Count I: Violation of Civil Rights Based on American National Origin

Plaintiff alleges that Defendants discriminated against her based on her "national origin" as a person whose "ethnic and cultural upbringing was rooted in the Southern traditions and particular

affectations of the regional flavor of that American locale." (Compl. ¶ 17.) In short, Plaintiff contends that Defendants discriminated against her based on her Southern accent. Plaintiff, however, does not cite any case that has found that "Southerness" or a "Southern accent" is a protected trait under Title VII's protections against national origin discrimination.[2] Plaintiff also conceded at oral argument that no court has recognized her theory.

This issue appears to be one of first impression in the Sixth Circuit. The United States District Court for the District of Massachusetts, however, addressed this issue in Williams v. Frank, 757 F. Supp. 112 (D. Mass. 1991), aff'd, 959 F.2d 230 (1st Cir. 1992), a case that is factually similar to the instant case. Id. at 120. The plaintiff testified that his supervisors mocked his drawl and speech pattern. Id. at 120 n.8. The Williams court found that "[p]laintiff's Southerness is not a protected trait" under Title VII and granted the defendant's motion for summary judgment. Id. at 120-21. The Court finds the reasoning of the Williams court to be persuasive.

Here, Plaintiff alleges that her supervisor, Nelson, told Plaintiff that her accent was unintelligible over the store's intercom, it "was not cute," and it sounded "ignorant." Even if taken as true, these allegations do not state an actionable claim under Title VII's protections against national origin discrimination, because they are grounded on discrimination against Plaintiff based on her "Southerness," which is not a protected trait. Accordingly, summary judgment will be granted in favor of Defendants on Count I.

## II.     Count II: Violation of Civil Rights Based on Disability

Plaintiff alleges that she was discriminated against in violation of both the ADA and the

---

[2] Plaintiff cites two EEOC administrative decisions, Killfoil v. Dep't of Justice, 100 F.E.O.R. 1320 (2000), and Yu v. United States Postal Service, 98 F.E.O.R. 1074 (1997), neither of which are persuasive because both involve foreign accents rather than regional American accents.

9

PDCRA because of her epileptic condition. There are two types of discrimination claims based on disability: (1) termination claims; and (2) failure to accommodate claims. Jones v. Sumser Retirement Vill., 209 F.3d 851, 853-54 (6th Cir. 2000) ("A termination claims differs in kind and date from an accommodation claim."). To determine which type of claim a plaintiff is alleging, a court must look to the plaintiff's EEOC charge form. Id. Here, Plaintiff's charge form simply states that she was "constructively discharged . . . based on my disability." (Charge Form, Pl.'s Answer Defs.' Mot. Summ. J. Ex. I.) Since Plaintiff does not mention in her charge form that she requested an accommodation, or that Cost Plus failed to provide a requested accommodation, the Court concludes that Plaintiff has stated only a termination claim.[3]

Assuming, *arguendo*, that Plaintiff has established that either her epilepsy or her neck condition constitutes a disability, Plaintiff has failed to present any admissible evidence that Defendants discriminated against her based on her disabilities. With regard to her epilepsy, Plaintiff does not allege that she was not allowed to take sufficient time off, nor does she allege that Nelson or other Cost Plus employees responded inappropriately to Plaintiff's seizures. While Plaintiff claims that Nelson revealed Plaintiff's condition and made jokes about it to several "vendors" and Cost Plus employees, Plaintiff only offers her third-hand recollection of alleged conversations

---

[3] At oral argument, Plaintiff's counsel contended that Plaintiff did request an accommodation from Nelson: to work at as a cashier and not to do stock work. For the first time, Plaintiff's counsel asserted that this request was based on Plaintiff's epilepsy and not on Plaintiff's alleged past back surgery. Plaintiff's counsel's statements, however, are contradicted by Plaintiff's own deposition testimony, in which Plaintiff stated that her epileptic condition only limits her ability to work when she is actually having a seizure, or in the days immediately following a seizure when she is required to rest. (Pl. Dep. at 182-83.) Plaintiff's counsel also stated that Plaintiff experienced multiple, minor seizures per day, which was also directly contradicted by Plaintiff's deposition testimony, in which Plaintiff estimated that she had a total of three seizures from 1997 through 2002. (Id. at 183.) Since arguments made by Plaintiff's counsel that contradict Plaintiff's own deposition testimony cannot serve as a basis to defeat a motion for summary judgment, the Court need not give any weight to Plaintiff's counsel's unsupported assertions in deciding this motion.
   Additionally, Plaintiff's counsel made numerous statements at oral argument regarding Plaintiff's alleged medical condition that were not raised in Plaintiff's brief or corroborated by evidence that is properly before the Court. Those statements also do not serve as a basis to defeat the instant motion.

10

between Nelson, "vendors," and employees, none of whose names and identities Plaintiff can recall. (Pl. Dep. at 164-68.)  At oral argument, Plaintiff's counsel conceded that the only proof of these allegations that were before the Court were in the form of inadmissible hearsay.  Such evidence is insufficient to rebut a motion for summary judgment.  Additionally, the fact that Nelson offered to convene a meeting of store employees to explain Plaintiff's condition, to which Plaintiff objected so Nelson never held the meeting, (Id. at 163-64), does not constitute actionable discrimination. Finally, with regard to her neck condition, Plaintiff has presented no evidence that she was ever required to do heavy lifting during her employment at Cost Plus.  Accordingly, summary judgment will be granted on Count II.

### III.    Count III: Hostile Work Environment

Plaintiff alleges that Defendants' intentionally created a hostile work environment by harassing her regarding her Southern accent and disability in violation of Title VII and the ELCRA. To establish a claim for hostile work environment, a plaintiff must identify discriminatory conduct by the defendant which, from the perspective of a reasonable person, was so severe or pervasive as to alter the conditions of the plaintiff's work environment and create an abusive working environment.  Hafford v. Seidner, 183 F.3d 506, 512-13 (6th Cir. 1999).

> In determining whether an environment is one that a reasonable person would find hostile or abusive and that the plaintiff in fact did perceive to be so, courts look at all of the circumstances, including:
> > [T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Id. at 512 (quoting Harris v. Forklift Sys. Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 371 (1993)).  The Supreme Court has repeatedly stated that "'simple teasing,' offhand comments, and isolated

incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'" and that "conduct must be extreme to amount to a change in the terms and conditions of employment." Id. at 512-13 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 2283-84 (1998) (citations omitted)).

In the instant case, Plaintiff alleges that Nelson made negative comments about Plaintiff's Southern accent on two occasions, and that Nelson asked Plaintiff to alter the way that she made announcements over the store's intercom. Plaintiff also claims that Nelson punished Plaintiff by assigning Plaintiff to "sparkle," rather than work as a cashier, and threatened to force Plaintiff to quit. With regard to discrimination based on her disability, Plaintiff offers only third-hand recollection of alleged conversations between Nelson, "vendors," and employees whose names and identities Plaintiff cannot recall. Finally, Plaintiff alleges that her hours were "radically cut back," but only offers evidence that she was scheduled to work a four-hour shift rather than an eight-hour shift on the day she returned from her vacation.[4] Plaintiff has offered no evidence that such a change was permanent or that it was made because of her accent or her disability. These allegations, taken as true, amount to nothing more than simple teasing, offhand comments, and isolated incidents. Furthermore, Plaintiff only complained about the work environment at Cost Plus to Cost Plus' human resources department after she stopped coming to work without calling her supervisor to account for her absences. Accordingly, summary judgment will be granted on Count III.

## IV.     Count IV: Intentional Infliction of Emotional Distress

---

[4] At oral argument, Plaintiff's counsel stated that Plaintiff's hours were drastically reduced before Plaintiff took her extended period of leave. Plaintiff has offered no evidence to support her allegation, and it appears that the only reduction in Plaintiff's hours occurred on her final day of work. Furthermore, there is no evidence that Plaintiff's hours were actually reduced after she returned from vacation, because, as Defendants' counsel pointed out, Plaintiff did not undertake any investigation into whether she had been permanently assigned to a reduced schedule or whether she was simply assigned a four-hour shift on one isolated day.

Plaintiff alleges that Defendants' conduct toward Plaintiff constituted intentional infliction of emotional distress.  To establish a prima facie case of intentional infliction of emotional distress under Michigan law, a plaintiff must show: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation;  and (4) severe emotional distress.  Andrews v. Prudential Secs., Inc., 160 F.3d 304, 309 (6th Cir. 1998).  "The outrageous conduct requirement is satisfied only by conduct that is 'so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  Id. (quoting Roberts v. Auto-Owners Ins. Co., 422 Mich. 594, 608-09, 374 N.W.2d 905, 911 (1985)).  Liability will only arise "where the distress inflicted is so severe that no reasonable man could be expected to endure it," id. (quoting Roberts, 422 Mich. at 608-09, 374 N.W.2d at 908-09), and not from "mere insults, indignities, threats, annoyance, petty oppressions or other trivialities," Roberts, 422 Mich. at 609, 374 N.W.2d at 909.  Simply put, the tort of intentional infliction of emotional distress does not give occasion "for the law to intervene in every case where someone's feelings are hurt."  Id.

Plaintiff does not offer any evidence that Defendants' conduct toward her was extreme and outrageous or extended beyond the bounds of decency when viewed from the standpoint of a reasonable person.  Plaintiff claims that she was offended by Nelson's alleged comments regarding Plaintiff's Southern accent and Nelson's preference for younger employees,[5] and that Nelson yelled at Plaintiff in the "vault room" on one occasion.  Plaintiff also alleges that Nelson told her: "either you quit or I will make your life hell."  (Pl. Dep. at 51-53.)  Additionally, Plaintiff claims that Defendants have hindered her ability to gain other employment, because Cost Plus has not sent

---

[5] The only evidence of age discrimination that Plaintiff has offered is Plaintiff's observation that a woman who appeared to be under forty-years-old was working as a cashier on the day that Plaintiff returned to work and Plaintiff's vague recollection of an alleged statement by Nelson that Nelson preferred younger workers.  As Defendants' counsel noted at oral argument, Plaintiff was hired by Cost Plus when she was in her forties, and Plaintiff has not offered any objective evidence of a pattern of age discrimination at Cost Plus's Lansing store.

13

Plaintiff's positive employee evaluations to Plaintiff's perspective employers. While Defendants' behavior toward Plaintiff, if true, is objectively unpleasant and may have hurt Plaintiff's feelings, it was not so severe that no reasonable person could be expected to endure it. Accordingly, summary judgment will be granted on Count IV.

**V:** **Counts V and VI: Violation of Civil Rights Based on Age and Retaliatory Discharge**

Plaintiff alleges that Defendants discriminated against her because of her age under the ADEA (Count V) and retaliatory discharge under Title VII (Count VI). In order for a federal court to have subject matter jurisdiction over claims arising under the ADEA or Tile VII, the claimant must first present his or her complaints to the EEOC. 29 U.S.C. § 626(d); Ang v. Proctor & Gamble Co., 932 F.2d 540, 545 (6th Cir. 1991). To present a claim to the EEOC, a claimant must submit an official charge form to the EEOC and identify the specific claims that the claimant is making by checking the appropriate boxes. Ang, 932 F.2d at 545; Minnis v. McDonnell Douglas Tech. Servs. Co., 162 F. Supp. 2d 718, 729 (E.D. Mich. 2001).

Plaintiff submitted to the EEOC her signed and notarized charge form dated March 11, 2002. (Charge Form, Pl.'s Answer Defs.' Mot. Summ. J. Ex. I.) Plaintiff checked the "disability" and "national origin" boxes, and did not check the "age" or "retaliation" boxes. (Id.) The narrative summary provided on Plaintiff's charge form details only Plaintiff's disability and national origin claims. (Id.) Thus, it appears that Plaintiff did not pursue her age and retaliation claims with the EEOC, which precludes her from raising those claims in the instant suit.

Plaintiff contends that her failure to state her age and retaliation claims on the EEOC charge form should be excused, because she did not personally type the information provided on her EEOC charge form and she mentioned the age and retaliation claims in letters and conversations with the

14

EEOC. Plaintiff's argument is unpersuasive. Plaintiff signed her charge form and had it notarized before she submitted it to the EEOC. Thus, Plaintiff had ample opportunity to review her charge form and correct any omissions or errors, despite the fact that she did not personally fill out the form. The blame for Plaintiff's failure to submit a charge form stating all of the claims that she "intended" to bring lies squarely with Plaintiff. Accordingly, summary judgment will be granted on Counts V and VI.

**VI:     Count VII: Negligent Supervision**

Plaintiff alleges that Nelson was negligently supervised by her superiors at Cost Plus. To establish a claim for negligent supervision under Michigan law, a plaintiff must present evidence of: (1) the appropriate standard for supervising or training the defendant employer's personnel; and (2) that the defendant employer knew or should have known that the defendant employee was likely to act harmfully to the plaintiff. Sanders v. Southwest Airlines Co., 86 F. Supp. 2d 739, 746 (E.D. Mich 2000).

Plaintiff claims to have established Cost Plus's standard for supervising or training its employees by making a vague reference to Cost Plus's Employee Handbook, without citing the specific section of the Employee Handbook upon which she relies. (Employee Handbook, Pl.'s Answer Defs.' Mot. Summ. J. Ex. R.) Even if the Court accepts the Employee Handbook as the appropriate standard for supervising or training Cost Plus's personnel, Plaintiff has failed to offer any evidence that Cost Plus negligently supervised Nelson. For example, Plaintiff could have offered the deposition testimony of Nelson's supervisor or the Cost Plus Human Resource Manager who listened to Plaintiff's complaint about Nelson. Plaintiff's failure to offer anything more than heated rhetoric to support her negligent supervision claim is insufficient to support her claim.

Accordingly, summary judgment will be granted on Counts VII.

## **Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment will be granted. An Order consistent with this Opinion with be entered.


Dated:  July 30, 2003                                         /s/ Gordon J. Quist
                                                                             GORDON J. QUIST
                                                                    UNITED STATES DISTRICT JUDGE